FRED LEE DAVENPORT,

                           Plaintiff,

        v.                                              Case No. 23-cv-1694-pp

LAURA C. SUKOWATY, *et al.*,

                           Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31), DENYING PLAINTIFF'S MOTION TO STAY ALL COURT PROCEEDINGS (DKT. NO. 53), DENYING PLAINTIFF'S MOTION FOR EXTENSION ON GOOD CAUSE (DKT. NO. 54), CONSTRUING PLAINTIFF'S MOTION FOR LEAVE TO FILE INTERLOCUTORY APPEAL AS MOTION FOR HEARING AND DENYING MOTION (DKT. NO. 57) AND DISMISSING CASE**

---

Plaintiff Fred Lee Davenport, who is incarcerated at Columbia Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on (1) an Eighth Amendment claim against defendant Dr. Laura Sukowaty based on allegations that she did not follow a specialist's treatment recommendations for the plaintiff's nerve pain, resulting in unnecessary pain and the worsening of his condition; (2) an Eighth Amendment claim against health services unit manager Alana Acker based on allegations that she knew about the ongoing failure to provide the plaintiff with the specialist-recommended medication but did not do anything; and (3) state law medical malpractice claims against the defendants. Dkt. No. 17 at 6-7. This order grants the defendants' motion for

summary judgment, dkt. no. 31, and dismisses the case. It also addresses motions the plaintiff filed after the defendants filed their motion for summary judgment, including a motion to stay all court proceedings, dkt. no. 53, a motion for extension of time for "good cause," dkt. no. 54, and a motion for leave to file an interlocutory appeal, dkt. no. 57.

## I.     Procedural Background, Plaintiff's Motions (Dkt. Nos. 53, 54, 57) and Plaintiff's Response to Defendants' Proposed Findings of Fact (Dkt. No. 55)

On December 13, 2024, the defendants filed a motion for summary judgment. Dkt. No. 31. Four days later, the court issued an order requiring the plaintiff to respond to the defendants' motion by January 13, 2025, and ordering that if the court did not receive his response by that deadline, it would treat the motion as unopposed and would rule without input from the plaintiff. Dkt. No. 38. The plaintiff subsequently filed three motions for extensions of that deadline, which the court granted. Dkt Nos. 39-44. In its order granting the plaintiff's third motion for an extension of time, the court extended the deadline to April 28, 2025, but said that it would not grant further extensions of the deadline unless the plaintiff could show extraordinary circumstances justifying an extension. Dkt. No. 44.

On April 15, 2025, the court received from the plaintiff a motion for sanctions and to stay all proceedings. Dkt. No. 45. On the same day, the court received from him a motion for an extension and for access to law library and discovery. Dkt. No. 46. The defendants moved for an extension of time to respond to the plaintiff's motions, dkt. no. 47, which the court granted, dkt. no.

48. On July 8, 2025, the court denied the plaintiff's motion for sanctions, his motion to stay proceedings and his motion for order for access to the law library and for discovery. Dkt. No. 52. The court granted the plaintiff's motion for extension of time. Id. The court said that it would give the plaintiff one, *final* extension of time to respond to the defendants' summary judgment motion. Id. at 5. The court warned the plaintiff that if it did not receive his response by August 8, 2025, it would resolve the defendants' motion without considering a response from the plaintiff. Id. at 5-6.

On August 13, 2025, the court received from the plaintiff a motion to stay all court proceedings. Dkt. No. 53. He sought the stay "on jurisdiction grounds," asserting that venue was proper in the Western District of Wisconsin. Id. On the same day, the court received from the plaintiff a motion for extension "on good cause," in which he said that he and other incarcerated individuals at Columbia Correctional had experienced a violation of their rights when staff failed to provide legal mail. Dkt. No. 54. He asserted that he did not "become aware of extension until 14 days after court issued order." Id. The plaintiff stated that Columbia's litigation coordinator was under an internal investigation for committing perjury for her statements in support of this case and that several supervisors were "aware of her provided input but [were] aware her statements to be dishonest." Id. The plaintiff sought leave to file an interlocutory appeal "on jurisdiction issues and sanctions." Id. He also stated that there was "an issue of discovery that needs to be addressed." Id.

3

The court received a third document from the plaintiff on August 13, 2025—his response to the defendants' proposed findings of fact. Dkt. No. 55.

Finally, on September 4, 2025, the court received from the plaintiff a separate motion for leave to file an interlocutory appeal, dkt. no. 57, along with several declarations filed by the plaintiff, dkt. nos. 58-61.

A.  <u>Plaintiff's Motion to Stay All Court Proceedings</u> (Dkt. No. 53)

The plaintiff asks the court to stay these proceedings on jurisdictional grounds because the parties are in the Western District of Wisconsin and the events described in the complaint occurred at Columbia Correctional, which is in the Western District. Dkt. No. 53. Generally, "[a] civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...." 28 U.S.C. §1391(b).

The court has discretion to transfer the case to another venue under 28 U.S.C. §1404(a). <u>In re Ryze Claims Sols., LLC</u>, 968 F.3d 701, 707 (7th Cir. 2020). Section 1404(a) states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The court "'must evaluate both the convenience of the parties and various public-interest considerations.'" <u>Id.</u> at 708 (quoting <u>Atl. Marine Const. Co., Inc. v. U.S. District Court for the W. Dist. of Tex.</u>, 571 U.S. 49, 62 & n.6 (2013)). District courts must conduct a flexible analysis and consider factors such as docket

4

congestion, the "likely speed to trial" in each forum, each forum court's "familiarity with the relevant law," the "desirability of resolving controversies in each locale" and "the relationship of each community to the controversy." Id. (quoting Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 978 (7th Cir. 2010)). The moving party has the burden of showing "that the transferee forum is clearly more convenient." Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220 (7th Cir. 1986).

The *plaintiff* filed this case in the Eastern District of Wisconsin. Although he is incarcerated at Columbia Correctional Institution, and the events described in the complaint took place at Columbia (which is in the Western District of Wisconsin), the plaintiff has not established that the defendants reside in the Western District. See 28 U.S.C. §1391(b). Even if he had, the plaintiff's assertion that he believes the venue he chose may be improper does state adequate grounds for transferring venue at this stage. Cf. American Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd., 364 F.3d 884, 887-88 (7th Cir. 2004) (if defendant stalls in pleading improper venue, conventional principals of waiver or equitable estoppel come into play and if invoked by plaintiff block the challenge to venue) (citations omitted). At the summary judgment stage, there is no need for parties to travel to court or participate in hearings; the court decides summary judgment motions on the pleadings. It would not be convenient to the parties for the court to transfer this case to the Western District at this stage, when summary judgment is pending. See 28 U.S.C. §1404(a). The court will deny the plaintiff's motion to stay proceedings.

B. <u>Motion for Extension on Good Cause</u> (Dkt. No. 54)

The plaintiff makes several assertions in this motion, which the court received on August 13, 2025. He says that he and other incarcerated persons experienced a violation of their rights when Columbia staff did not provide them with legal mail. Dkt. No. 54. He does not explain when this allegedly happened. He says that he "did not become aware of extension until 14 days after court issued order." <u>Id.</u> The court infers that the plaintiff meant to argue that among the mail the institution allegedly did not deliver was this court's July 8, 2025 order extending to August 8, 2025 his deadline for filing his opposition materials to summary judgment; the court infers that he meant to say that he did not receive the court's July 8, 2025 order until July 22, 2025. He says that Columbia's litigation coordinator is under internal investigation for committing perjury in relation to this case, although he does not explain how that relates to his request for an extension of time. He says that there is "an issue of discovery that needs to be addressed," but does not explain what that issue is or why he is only raising it now, some ten months after discovery closed. Finally, he says that this court "accepted defendant(s) statement that the events surrounding this med refusals . . . ." <u>Id.</u> It is not cleat what this sentence fragment means.

The court interprets this document as the plaintiff's request for the court to extend—yet again—the deadline for him to respond to the defendants' motion for summary judgment, perhaps until Columbia has completed the investigation of the litigation coordinator. The court will deny that request. The

6

plaintiff has not shown good cause for another extension of time. If he received this court's July 8, 2025 order on July 22, 2025, he still had over two weeks to prepare his response and file it by the August 8, 2025 deadline the court had set. He did not do so. He does not explain when the investigation of the litigation coordinator began or when it might be resolved, or even how that might impact his response to the summary judgment motion. And although the plaintiff mentions wanting to file an interlocutory appeal "on jurisdiction issues and sanctions," this motion does not raise an issue that is proper for certification of an interlocutory appeal. See 28 U.S.C. §1291(a), (b). The court will deny the plaintiff's motion for extension of time.

C.      Response to Defendants' Proposed Findings of Fact (Dkt. No. 55)

On August 13, 2025—the same day the court received the plaintiff's motion to stay all court proceedings and his motion for an extension for good cause—the court received from the plaintiff his response to the defendants' proposed findings of fact. Dkt. No. 55. The court received this filing five days after the August 8, 2025 deadline the court had set for the plaintiff to respond to the defendants' summary judgment motion. Even so, the court will consider the filing to the extent that it complies with the applicable Federal Rules of Civil Procedure and this court's Local Rules.

D.      Motion for Leave to File An Interlocutory Appeal (Dkt. No. 57)

The court received this motion on September 24, 2025. The plaintiff says that he moves to file an interlocutory appeal regarding the following issues: jurisdiction, plaintiff's preliminary injunction, motion to appoint counsel, first

and second motions for sanctions and motion for extension. Dkt. No. 57 at 1.
He says that he's filed several motions that this court either has failed to
properly address and rule on, failed to timely address or failed to show
impartiality. Id. He says, "This court continues to make orders that have failed
to be given to plaintiff real court orders that the defendants agency has
purposely withheld." Id. He lists three individuals—Sammy Smith, Jovan
Williams, David Sierra Lopez and London Neal—whom he says "has expressed
this issue." Id.[1] The plaintiff asserts that he's written to defense counsel about
staff misconduct and says that in several of his court filings, he expressed that
he lacked discovery, but that the court did not address the issue. Id. In this
filing, the plaintiff raises issues with the court's prior orders in this case.
Specifically, he says that the court failed to address his court filings in which
he said he lacked complete discovery. Id. The plaintiff says that he has filed
several other cases over the years alleging that Columbia staff are allowing him
to self-harm, and that he keeps filing for extensions of time because he has
been placed on observation, "strapped down, off grounds at the hospital for
self-harming and [the court] express[es] in [its] order in [the plaintiff's]
interpretation that [the plaintiff] attempting to kill [himself] every other day
isn't a[n] extraordinary circumstance." Id. at 1-2.

The plaintiff states that the undersigned judge has shown clear
indifference to his well-being and bias because it allowed the defendants to

---

[1] The affidavits that the court received from the plaintiff on September 4, 2025
are from these four individuals, who attest to issues they have had with staff at
Columbia Correctional. Dkt. Nos. 58-61.

commit perjury and to retaliate against him. Id. at 2. He states that the court disregarded his mail tampering allegations, failed to timely address his motion for preliminary injunction and failed to exclude false evidence. Id. The plaintiff asserts that the court allowed the defendants to include false evidence about an issue related to an alleged false signature. Id. He says that multiple court orders have been delivered to him weeks late. Id.

The plaintiff states that missing documents have been an ongoing issue at Columbia. Id. at 3. He says that the court has failed to ensure that all parties and their agencies are preserving due process, and that that failure has "substantially burden[e]d fair litigation and due process of the law." Id. at 3, 4. The plaintiff states that he keeps saying that "BWC footage" would corroborate his recollection of events, but that no hearings or conferences have been held, which shows judicial bias. Id. at 4. The plaintiff states that the court has continuously disregarded his assertions that written, visual and audio materials contradict the defendants' filings, which shows that the court is biased. Id.

The plaintiff asserts that in April 2025, he wrote to "Attorney Bradley P. Sholdon" (Attorney Samir S. Jaber represents the defendants in this case) about not having complete discovery. Id. at 5. Correctional officer supervisors allegedly would "corroborate they've contacted the Litigations Coordinator about this issue[.]" Id. The plaintiff states that he can prove all of this, and he asks the court to take time to allow him "due process [and] equal protection." Id. The plaintiff states that "CCI [Columbia Correctional Institution] is dirty,

Alana is corrupt, Bradley P. Sholdon is corrupt, Mary Liesure is corrupt, and Rebecca Keeran personally hates [him]." Id. He says that he can prove it, and he requests that the court allow him the chance to prove it. Id.

The plaintiff asks the court to hold a status conference or hearing to address the issues raised in his motion. Id. at 6. He asks, "Is this a mandamus situation? Is this a[n] interlocutory situation? Can you just attempt to remedy this situation[?]" Id. The plaintiff asserts that the court has caused too many head-scratching situations with its rulings and orders, and he states that he won't stop turning to the Seventh Circuit. Id. He says that his attachments support his arguments "to show every argument [he] present[s] is the same argument we all at CCI present if this court won't reco[g]nize the pleas of the masses it fail[]s to protect the very Constitution that it retains its authority [sic]." Id.

The plaintiff's motion is titled "Leave to file an Interlocutory Appeal," but the text of his motion asks *this court* to hold a hearing to address the various issues the plaintiff raises in the filing. The court construes the plaintiff's motion as a request for a hearing before this court (rather than a request for leave to file an interlocutory appeal to the Seventh Circuit). See Terry v. Spencer, 888 F.3d 890, 893-94 (7th Cir. 2018) (court should read *pro se* filings liberally, looking past their labels and focusing on their substance).

The court has addressed the motions the plaintiff has filed in this case. The court has given the plaintiff multiple extensions of time to respond to the defendants' motion for summary judgment, which they filed in December 2024.

Instead of responding to the defendants' motion, the plaintiff has filed more motions. He has not filed a motion to compel discovery, nor has he specified what relevant discovery he sought from the defendants that they did not provide him. It is not uncommon for incarcerated individuals to experience delays in receiving mail. The court generally is lenient in granting motions for extensions of time filed by incarcerated individuals, and the court has been lenient with the plaintiff. The plaintiff has filed a partial response to the defendants' motion for summary judgment. His response to the defendants' proposed findings of fact is verified, which means that when resolving the defendants' motion the court can consider his assertions regarding things about which he has first-hand knowledge. The court will not hold a telephone conference because the court previously has addressed the issues the plaintiff raises in his motion and/or the issues are not relevant to his claim in this case. The court will deny the plaintiff's motion for a hearing.

## II.    Facts[2]

The plaintiff is incarcerated at Columbia and was confined there during the events described in the complaint. Dkt. No. 33 at ¶1. Defendant Alana Acker, a registered nurse, works as the health services manager (HSM) at Columbia. Id. at ¶2. Defendant Dr. Laura Sukowaty is employed by Wisconsin Department of Corrections' (DOC) as an associate medical director, headquartered at Dodge Correctional Institution. Id. at ¶3.

---

[2] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

## A. Role of the Health Services Manager

As the HSM at Columbia, under the general supervision of the Warden, Acker provides overall administrative support and direction of the unit and provides liaison assistance to other disciplines and institution units. Id. at ¶4. She also provides administrative oversight to the primary care providers, dentists, psychiatrists, and specialists. Id. The HSM supervises the nursing staff in the HSU, including licensed practical nurses, registered nurses, and the Medical Program Assistant Associate (MPAA). Id. ¶5. The HSM does not supervise advanced care providers (physicians and advanced practice nurse prescribers). Id. at ¶6.

Acker did not have the authority to override scheduling decisions, prescribe medication (other than over-the-counter drugs per specific nurse protocols), refer patients to offsite specialists, order imaging studies, or override the treatment decision of the dentists, physicians, nurse practitioners and/or physician assistants. Id. at ¶7. The HSM generally does not evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with an incarcerated individual. Id. at ¶8. The only time Acker would provide treatment to a patient as a nurse is in times of staffing shortages. Id. According to the plaintiff, he consistently complained about misconduct by HSU staff, so he had "countless" interactions with Acker. Dkt. No. 55 at ¶8.

B.     Response to Health Service Requests

When an incarcerated individual has a medical concern, wishes to communicate with medical staff and/or asks to be seen by HSU staff, he fills out a health service request (HSR) form and submits it to the HSU. Dkt. No. 33 at ¶10. Once nursing staff has triaged and responded to an HSR, it is placed in the incarcerated person's personal request folder portion of the medical record. Id. at ¶12. A response will indicate whether the individual is scheduled to be seen, whether the HSR is referred to another staff member or referred for copies or a record review, or whether education materials are attached. Id. Even though an HSR may be directed to a specific staff member, HSRs are triaged in the same manner for patient care and safety, which means they still will be triaged by the nurse. Id. at ¶13. Any requests the triaging nurse considers emergent will be dealt with immediately. Id.

When the plaintiff submitted HSRs or requests to HSU addressed to Acker or Dr. Sukowaty, or complaining that he was experiencing pain, these HSRs would have been triaged according to policy by nursing staff. Id. at ¶14. In most cases, Acker and/or Sukowaty would not have been made aware of these requests unless they were specifically forwarded to them by the nursing staff. Id.

C.     Offsite Provider Recommendations

A DOC advanced care provider (ACP), such as a physician or advanced practice nurse prescriber, may seek a specialty consultation with an offsite provider. Id. at ¶17. An offsite provider does not have prescriptive authority

13

within the state correctional institutions. Id. at ¶18. Recommendations and prescriptions that are written by an offsite provider are recommendations only. Id. Recommendations from offsite providers must be reviewed by an onsite DOC provider to ensure that they are appropriate for use in an institution. Id. at ¶19. Often, offsite providers do not understand security restrictions within a prison and will recommend patients be provided with a medication or accommodation that poses a risk to the safety and security of the institution. Id. at ¶20.

D.    Formulary vs. Non-Formulary Medications

The DOC formulary is a list of prescription and nonprescription medications that are ordinarily available to authorized prescribers working for the DOC. Id. at ¶21. Formulary medications are medications that ACPs may prescribe to incarcerated individuals without prior approval, while non-formulary medications are medications that are not listed on the formulary and require approval. Id. at ¶22. An ACP may consider prescribing a non-formulary medication when alternative formulary medications have been proven not to be effective or not contraindicated. Id. at ¶23.

E.    Pregabalin within a Correctional Setting

Pregabalin, most commonly sold under the brand name Lyrica, is a medication used to treat nerve pain and is also used to control seizures in epilepsy. Id. at ¶24. Pregabalin is a non-formulary medication. Id. at ¶25. If an ACP wishes to prescribe pregabalin to an incarcerated individual, the ACP must submit a non-formulary request, and the associate medical director must

review the request to determine whether it is appropriate for the individual to receive that medication. Id.

Pregabalin may have negative side effects if mixed with certain other medicines, alcohol or illicit drugs. Id. at ¶26. Pregabalin can be problematic in a correctional setting because it has a potential for misuse and diversion. Id. at ¶27. Incarcerated individuals often divert pregabalin to others for secondary gain (for money) or are extorted for their pregabalin prescriptions. Id. Additionally, incarcerated persons often will store up doses of pregabalin to take them all at the same time to get high off the medication or they will snort pregabalin to get a high similar to Valium, sometimes in conjunction with other drugs. Id. at ¶28. These behaviors can lead to serious health, safety and security concerns. Id.

Formulary options that need to be exhausted prior to approving pregabalin include over-the-counter analgesics and nonsteroidal anti-inflammatory drugs (NSAIDs) such as Tylenol, celecoxib, meloxicam, ibuprofen and/or topical analgesics. Id. at ¶29. Amitriptyline and duloxetine, both antidepressants, also are often highly effective at treating neuropathic pain and have a much lower risk of abuse. Id.

As an associate medical director, Dr. Sukowaty must be careful in reviewing requests for pregabalin. Id. at ¶30. She reviews the purpose for which the ACP wishes to prescribe pregabalin, whether the medication is indicated to treat the condition for which it is being requested and whether the ACP attempted to use alternative medications. Id. Additionally, if available, she

15

reviews information about the incarcerated individual's history with medications, including whether he has ever been caught diverting medications or using illicit substances. Id. If an incarcerated individual has been accused of diverting medication, found guilty of misuse of medication, or found guilty of possession of intoxicants, this information is taken into consideration when determining whether it is appropriate to prescribe pregabalin. Id. at ¶31.

Prescribing pregabalin to an incarcerated individual with a history of diverting medication poses a risk of possible addiction and abuse. Id. at ¶32. It also poses a risk to other incarcerated persons who might receive the diverted pregabalin from the individual diverting it. Id. Finally, it could pose a security risk and thwart the institution's work in preventing medication abuse in the institution. Id. According to the plaintiff, Columbia crushes pregabalin and "floats" it, so divergence is impossible. Dkt. No. 55 at ¶32.

Prescribing pregabalin to an incarcerated individual with a history of illicit substance use poses a risk to the incarcerated person of possible adverse side effects. Dkt. No. 33 at ¶33. Once it has been determined that a patient has misused or diverted pregabalin, he typically is no longer eligible to receive that medication. Id. at ¶34. This also is true if a patient is found taking illicit substances. Id.

F.    Medication Trials

A DOC provider must consider certain criteria before requesting pregabalin. Id. at ¶35. This includes an adequate trial of alternative medications, including, but not limited to: Tylenol, NSAIDs, amitriptyline

16

and/or duloxetine. Id. An adequate amount of time to trial a medication depends on the medication itself. Id. at ¶36. Most medications take anywhere from four to six weeks to start seeing any benefit, and generally an adequate trial of a medication includes the patient consistently taking the medication as prescribed for anywhere from four to twelve weeks. Id. According to the plaintiff, he was prescribed Tylenol "for years since 2019 in [the Milwaukee County Jail] by Laura C. Sukowaty and she persisted with this course [of treatment] knowing it to be ineffective." Dkt. No. 55 at ¶36. The plaintiff also states that Celebrex is an anti-inflammatory like Meloxicam which was reported not to work in the past. Id.

G.    Conduct Reports for Intoxicants

On August 20, 2021, the plaintiff received Conduct Report 184216 for possession of intoxicants, possession of contraband—miscellaneous, and use of intoxicants after a cell search located folded up pieces of paper, a piece of paper with a money account name on it, an altered nail clipper and two altered fans. Dkt. No. 33 at ¶38. The plaintiff admitted to using K2, a synthetic cannabinoid intended to mimic THC, at his due process hearing. Id. at ¶39. He was found guilty of all violations in Conduct Report 1184216. Id. at ¶40.

On December 30, 2021, the plaintiff received Conduct Report 219928 for lying and possession of intoxicants after he lied about having state issued clothing to wear to attend to a due process hearing and an officer found pieces of paper with a green leafy substance and an altered fan. Id. at ¶41. The green leafy substance was tested, and the result yielded reddish stains, which

17

indicated cannabis. Id. at ¶42. The plaintiff accepted this conduct report as uncontested. Id. at ¶43.

On September 14, 2024, the plaintiff received Conduct Report 407980 for possession of intoxicant paraphernalia, misuse of state or federal property, and possession of contraband—miscellaneous after a search of his cell found miscellaneous paperwork and toilet paper with burn or blackish marks on them, three pen inserts, paper rolled up into a smoking mechanism, an envelope with a yellowish-brown mark, one screw and a piece of metal. Id. at ¶44. An outlet on the overhead light also was black in color and had burn mark residue. Id. The plaintiff was found guilty of possession of intoxicant paraphernalia and misuse of state or federal property, but not guilty of possession of contraband—miscellaneous. Id. at ¶45.

According to the plaintiff, he was mistakenly found guilty of possession of intoxicant paraphernalia and he discovered this when his medication was discontinued. Dkt. No. 55 at ¶¶44-45. He says that he contacted security staff and upon investigation, it was deemed that security staff had made a mistake. Id. The plaintiff states that staff members contacted the HSU to have the plaintiff's medication reinstated. Id.

H.      Relevant Diagnoses

The plaintiff is diagnosed with lumbar spondylosis and lumbar radiculopathy. Dkt. No. 33 at ¶46. Lumbar radiculopathy, also known as sciatica, is caused by compression of the sciatic nerve that leads to pain that may radiate down one or both sides of the body. Id. at ¶47. Lumbar

spondylosis is age-related degeneration of the vertebrae and discs in the lower back and is typically caused by trauma or chronic repetitive loading and hyperextension. Id. at ¶48. Lumbar spondylosis can cause stiffness, pain and discomfort in the lower back. Id.

NSAIDs, Tylenol and topical analgesics are appropriate treatment options for lumbar spondylosis and radiculopathy. Id. at ¶49. The goal of treating these types of conditions is not the complete removal of pain, because this often is not realistic. Id. While pain control is a goal, the main goal is to ensure the patient can function as normally as possible. Id.

I.    Relevant Treatment

The plaintiff transferred to Columbia on September 23, 2022, with a prescription for acetaminophen, 500mg twice per day as needed for pain. Dkt. No. 33 at ¶¶50, 52. Sukowaty was his assigned provider at Columbia. Id. at ¶51.

On October 3, 2022, Nathaniel Botheld, who is a physical therapist, saw the plaintiff to evaluate his reports of lower back pain radiating to his posterior bilateral feet. Id. at ¶53. Bothfeld gave the plaintiff a "home exercise program" and a TENS unit, which is a small device that uses electrical currents to relieve pain. Id. According to the plaintiff, the TENS unit was defective. Dkt. No. 55 at ¶53.

Two days later, the plaintiff underwent an MRI of his lumbar spine, which found a sizeable disc bulge from the lumbosacral level that could explain his pain. Dkt. No. 33 at ¶54. In layman's terms, the plaintiff's MRI showed that

19

the cushioning area between the vertebrae (the disc) had bulged out and was potentially pushing on the nerves exiting the spine. Id. Typically, if a disc bulges to the side, there is evidence that it is pressing on the nerve; however, the radiologist noted that this was not confirmed on the MRI. Id. So, based on this MRI, it was possible that the disc bulge was causing the plaintiff's pain, but it also was possible that it was causing no issues. Id. Some people have bulging discs with no symptoms while others experience pain. Id.

Anti-inflammatories are the best course of treatment because they work well to relieve the irritation in the muscles caused by the irritated nerve. Id. at ¶55. There also are pain relief properties in anti-inflammatories and combining Tylenol and an NSAID work particularly well together to relieve pain. Id. They are a safe option in both DOC and the community. Id.

On October 10, 2022, Advanced Practice Nurse Prescriber (APNP) Charles Dombeck ordered diclofenac gel, three times per day for the plaintiff. Id. at ¶56. This is an anti-inflammatory topical cream applied directly to the skin to help reduce inflammation. Id.

Three days later, Sukowaty sent the plaintiff a letter informing him that his MRI had revealed a bulging disc, but that there was no evidence that it involved any nerves. Id. at ¶57. Sukowaty informed him that anti-inflammatory medications are the best treatment for this type of condition, but that if these were ineffective, they could pursue a steroid injection. Id.

On October 20, 2022, Bothfeld saw the plaintiff for physical therapy where the plaintiff reported adherence to his home exercise program, but that

he had not been using the TENS unit. Id. at ¶58. Bothfeld reviewed the plaintiff's home exercise program and progressed it to include repetitive extension exercises to promote anterior disc migration and educated the plaintiff on the importance of avoiding loaded lumbar flexion for sixteen weeks. Id. He also encouraged the plaintiff to use the TENS unit on his housing unit. Id. The plaintiff reiterates that the TENs unit was defective. Dkt. No. 55 at ¶58.

The next day, Sukowaty saw the plaintiff for complaints of chronic lower back pain. Dkt. No. 33 at ¶59. The plaintiff complained that he was in constant pain that sometimes radiated down his leg, but reported no numbness, weakness or tingling. Id. He had been through physical therapy, which he reported did not help. Id. The plaintiff was not on any NSAIDs but was willing to try them. Id. Sukowaty ordered Celebrex (celecoxib), an anti-inflammatory medication prescribed to reduce inflammation, 200mg twice per day. Id. If the Celebrex did not help, they would proceed with potential epidural steroid injections (ESI). Id.

On November 11, 2022, the plaintiff had a physical therapy appointment where Bothfeld reviewed his home exercise program, his MRI results and implications for physical therapy, his plan of care and disc healing rates. Id. at ¶60. Bothfeld planned to follow up with the plaintiff in four weeks. Id.

Four days later, Sukowaty placed a referral for the plaintiff to receive an epidural steroid injection based on his complaints that Celebrex was not helping his pain. Id. at ¶62. An epidural steroid injection is a shot of a steroid and numbing medication into the space between the spinal cord and bones of

the back. Id. at ¶63. It helps relieve pain caused by an irritated or swollen nerve root. Id.

On December 6, 2022, the plaintiff was seen by Dr. Sean Mackenzie with the Divine Savior Hospital Physical Medicine and Rehab for an evaluation of lower back and right knee pain that radiated down both legs. Id. at ¶64. Mackenzie reviewed the plaintiff's recent MRI, which showed multilevel disc bulging, worst at L4-5. Id. Mackenzie discussed options, including medications, physical therapy, injections and surgery. Id. He recommended pregabalin (Lyrica), an epidural steroid injection, MRI of the plaintiff's knee and follow-up with podiatry for any feet problems. Id.

According to the defendants, that same day, the plaintiff told Nurse Winkler, "I'm not chasing a pill high I have other stuff to get high from" after he was told that recommendations from offsite providers needed to be reviewed by a DOC provider. Id. at ¶65. Sukowaty reviewed this note, which indicated to her that the plaintiff probably had access to and was taking illicit drugs. Id. at ¶66. According to the plaintiff, he never told Nurse Winkler what she says he did. Dkt. No. 55 at ¶66.

On December 19, 2022, Acker saw the plaintiff for a nurse sick call after he was found unresponsive in his cell. Dkt. No. 33 at ¶67. The plaintiff was able to ambulate to the HSU. Id. When asked what he had taken, he smiled. Id. An officer said he had taken blue and white pills. Id. HSM Acker asked, and the plaintiff stated that it was pregabalin and that he had taken eighteen to nineteen pills from another incarcerated individual. Id. He refused to take

22

charcoal. Id. Acker called Dr. LaVoie as the on-call physician and LaVoie recommended that as long as the plaintiff could comprehend and follow tasks and respond, the HSU should continue to monitor him. Id.

On December 22, 2022, Sukowaty reviewed the plaintiff's offsite recommendations and scheduled an MRI for his knee and an epidural steroid injection for his back. Id. at ¶68. Because of pregabalin's potential for abuse and the plaintiff's history of illicit drug use, Sukowaty declined the recommendation for pregabalin because the plaintiff had not trialed safer medications first. Id.

Mixing pregabalin and THC or K2 can lead to adverse effects such as tachycardia (elevated heart rate), elevated blood pressure, unconsciousness, tremors, seizures, vomiting, hallucinations, agitation, anxiety, numbness and tingling. Id. at ¶69. So it was especially important to exhaust all formulary options before approving the plaintiff for a high-risk medication such as pregabalin. Id. According to the plaintiff, he never exhausted "all formulary options" and it wasn't until he moved for a preliminary injunction in this case that Sukowaty prescribed pregabalin. Dkt. No. 55 at ¶69. The plaintiff states that there were other listed formulary options. Id.

On December 24, 2022, Acker saw the plaintiff, who asked when he would see the doctor. Dkt. No. 33 at ¶70. Acker advised the plaintiff that he had an appointment with Sukowaty that week and a couple of upcoming offsite referrals. Id. Five days later, Sukowaty saw the plaintiff for back and foot pain. Id. at ¶71. The plaintiff had pending appointments for an MRI for his knee and

a steroid injection for his back, so no further changes to the plan of care for his back pain were necessary. Id. at ¶71.

On January 27, 2023, Sukowaty responded to an interview/information request submitted by the plaintiff in which he reported that he was in pain. Id. at ¶72. Sukowaty noted that the plaintiff had a pain services appointment scheduled. Id. She planned to follow up with him after that appointment to discuss a plan of care. Id.

On February 16, 2023, Bothfeld discharged the plaintiff from physical therapy, noting that the plaintiff had met his goals in that his lumbar spine range of motion was full, his trunk strength was full and he could complete his regular activities of daily living. Id. at ¶73. Bothfeld also noted that any remaining impairment in the plaintiff's back was subjective, and that he had an upcoming steroid injection scheduled. Id.

About a week later, Mackenzie saw the plaintiff for a steroid injection, which he tolerated well. Id. at ¶74. Mackenzie recommended pregabalin and medical shoes. Id. Sukowaty approved the plaintiff for medical shoes, which he received in March 2023. Id. at ¶75. But Sukowaty did not prescribe pregabalin because the plaintiff had not completed adequate trials of safer medication options. Id.

On March 14, 2023, Mackenzie saw the plaintiff for a follow-up to his recent steroid injection, which he reported provided him with fifty percent improvement in pain. Id. at ¶76. Mackenzie recommended another steroid injection, strengthening exercises and pregabalin. Id. Sukowaty reviewed the

24

offsite recommendation for pregabalin but recognized that the plaintiff had not yet completed adequate trials of safer alternatives. Id. at ¶78. Sukowaty determined that the plaintiff would need to try other medications before she would prescribe pregabalin. Id.

On March 24, 2023, Sukowaty saw the plaintiff for a follow-up to his first steroid injection. Id. at ¶79. He reported about fifty percent improvement in his pain and that he tolerated exercise well. Id. The plaintiff was scheduled for another injection in about a month, so no changes to his plan of care were necessary. Id. According to the plaintiff, he still reported chronic pain and he was left in "unnecessary, wanton and preventable pain." Dkt. No. 55 at ¶79.

On June 3, 2023, Acker went to the plaintiff's cell front after another incarcerated individual informed her that the plaintiff was "unable to move." Dkt. No. 33 at ¶80. The plaintiff was lying on the floor. Id. When Acker knocked, he got up easily and told her, "You need to do something, I can't move for [sic] touch my toes." Id. When Acker told him that he seemed to get up quite easily, he told her that he was in "pain so bad that everything is hurting." Id. Acker told him that she would review his chart and get back to him if any changes to his plan of care needed to be made. Id. Acker reviewed the plaintiff's chart and found that he was prescribed a pain reliever (acetaminophen) and anti-inflammatory (celecoxib), but that he was intermittently refusing/missing doses. Id. at ¶81. According to the plaintiff, he was not refusing medication; rather, his medication was not always available. Dkt. No. 55 at ¶81.

That same day, Acker informed the plaintiff that he was scheduled to be seen on June 5 (in two days) and that the HSU had noted that he was not taking his pain reliever and anti-inflammatory as prescribed. Dkt. No. 33 at ¶82. Acker advised the plaintiff to take his medications as prescribed and to discuss them at his upcoming appointment. Id. She also advised him that he had an upcoming appointment for a steroid injection, and that he should keep it. Id.

On June 9, 2023, Mackenzie saw the plaintiff for a steroid injection, which the plaintiff tolerated well. Id. at ¶83. Mackenzie did not include any additional recommendations following this appointment. Id.

One week later, on June 16, 2023, the plaintiff submitted an interview/information request in which he denied refusing to see the HSU and not taking his medications. Id. at ¶84. Five days later, Acker told the plaintiff that she would see him on June 28 to follow up with him. Id.

On June 28, 2023, Acker met with the plaintiff for complaints of back pain, and the plaintiff had several concerns he wished to discuss. Id. at ¶85. According to the defendants, they discussed, among other things, that the plaintiff wanted pregabalin. Id. at ¶87. The plaintiff said that they should look at Mackenzie's recommendations and imaging. Id. Acker informed him that Sukowaty needed to place a request for a prior authorization for pregabalin and that another doctor would review and determine the need. Id. The plaintiff agreed and understood. Id. The plaintiff disputes that these exchanges took place. Dkt. No. 55 at ¶¶85-87.

The same day, Acker sent the plaintiff a letter to summarize their visit, noting that they would await his follow-up with Mackenzie to see what was determined regarding his last injection. Dkt. No. 33 at ¶88.

On July 3, 2023, Mackenzie saw the plaintiff and the plaintiff reported that his previous steroid injection helped his pain around thirty to forty percent and his function around forty to fifty percent, but that he still had back pain radiating down his legs. Dkt. No. 33 at ¶89. He reported that physical therapy, Celebrex, diclofenac gel and Tylenol did not help his back pain. Id. Mackenzie recommended to discontinue the diclofenac gel, do a repeat steroid injection and prescribe pregabalin (Lyrica). Id. When Sukowaty reviewed the plaintiff's offsite recommendations for pregabalin, she noted that she would not prescribe pregabalin due to the plaintiff's history of THC use and the risks related to the interaction between pregabalin and THC. Id. at ¶90. Sukowaty planned to discuss alternative pain medications with the plaintiff at their next scheduled appointment. Id.

On August 20, 2023, Acker responded to an HSR in which the plaintiff asked about an appointment with Sukowaty. Id. at ¶91 Acker responded by advising him that he was scheduled for August 30, but that this could always be changed. Id.

On August 29, 2023, Sukowaty saw the plaintiff to discuss his back pain. Id. at ¶92. At this time, the plaintiff had his third steroid injection scheduled, so they planned to revisit his options after that injection. Id. Sukowaty noted that although Mackenzie continued to recommend pregabalin,

it was not a good choice due to the plaintiff's history of K2 and THC use. Id. Instead, Sukowaty started the plaintiff on amitriptyline, 10mg daily. Id. Amitriptyline is a tricyclic antidepressant often used to treat nerve pain. Id. Sukowaty chose to start the plaintiff on amitriptyline at this time because he still was complaining of pain after his steroid injections, and studies show that amitriptyline is effective in treating nerve pain. Id. at ¶93. It also has a lower risk of abuse or interaction with K2 or THC, so Sukowaty believed it was an appropriate choice to address the plaintiff's concerns. Id.

On September 1, 2023, the plaintiff was seen by Mackenzie for a steroid injection, which he tolerated well. Id. at ¶94. Mackenzie again recommended pregabalin. Id. Ten days later, Sukowaty switched the plaintiff to duloxetine (Cymbalta) after she was informed that he refused to take the amitriptyline. Id. at ¶95. Duloxetine is another antidepressant used to treat nerve pain. Id. Sukowaty chose to switch the plaintiff to duloxetine after he refused the amitriptyline because duloxetine is another medication that is effective in treating nerve pain and has a lower risk of abuse or interaction with K2 or THC. Id. at ¶96. According to the plaintiff, RN Nicholas Hancar recommended that he stop taking amitriptyline because the plaintiff reported suicidal ideology. Dkt. No. 55 at ¶95.

On September 20, 2023, Sukowaty reviewed the plaintiff's offsite recommendations for pregabalin and again noted that she would not be prescribing this due to the plaintiff's history of THC use. Dkt. No. 33 at ¶98. Instead, she ordered a functional evaluation to determine how the plaintiff was

28

functioning in his daily activities outside of the HSU. Id. The plaintiff still was prescribed Celebrex, diclofenac gel, acetaminophen and duloxetine. Id.

On October 12, 2023, Sukowaty saw the plaintiff, at which time he told her that he had good pain relief with his last steroid injection and was not in pain at that time. Id. at ¶99. He was scheduled for another injection in the near future. Id. They also discussed his duloxetine prescription and the plaintiff reported that he was not feeling much relief; Sukowaty determined he may need more time with the prescription to feel any therapeutic effect. Id.

On October 31, 2023, the plaintiff was seen by Mackenzie for a follow-up to his previous steroid injection. Id. at ¶100. The plaintiff reported that the injection had provided him with 65% improvement in pain and function. Id. He further reported that he was taking duloxetine, but that it was not helping. Id. Mackenzie recommended that he continue with steroid injections every three months, pregabalin and home exercises. Id.

On November 9, 2023, the institution complaint examiner (ICE) reached out to Acker regarding complaint CCI-2023-16855, in which the plaintiff alleged that Sukowaty had disregarded Mackenzie's recommendation for Lyrica. Id. at ¶101. Acker reviewed the plaintiff's records and saw that Sukowaty had reviewed Mackenzie's offsite recommendation and entered a note saying that she would increase the plaintiff's pain medications and order another steroid injection. Id. at ¶102. Sukowaty would not be ordering pregabalin due to the plaintiff's history of THC use. Id. Acker further advised the ICE that offsite specialists could recommend a treatment plan, but that the DOC has policies

regarding pregabalin and the plaintiff did not meet the criteria. Id. It was not necessary for Acker to get involved with the plaintiff's plan of care. Id. at ¶103. Sukowaty was providing the plaintiff with pain relief based on her training and expertise and was following the policies set in place by DOC for pregabalin. Id.

On November 10, 2023, Sukowaty reviewed the plaintiff's offsite recommendations for pregabalin and again noted that she would not be prescribing this due to his history of THC use. Id. at ¶104. Instead, she increased his duloxetine dose to 60mg and ordered another steroid injection. Id. The plaintiff also still was prescribed acetaminophen, Celebrex, and diclofenac gel. Id. On November 21, 2023, the ICE reached out to Acker regarding complaint CCI-2023-17315, in which the plaintiff had alleged that his duloxetine was discontinued for five days out of retaliation for his filing a previous complaint. Id. at ¶105. Acker reviewed the plaintiff's records and saw that on September 11, he reported having side effects from a previous medication, so Sukowaty prescribed duloxetine. Id. at ¶106. After the plaintiff's offsite appointment, Sukowaty increased his duloxetine prescription, but there was a lapse in dosing due to the way the duloxetine was ordered. Id. The plaintiff did miss some doses, but it was not out of retaliation. Id. It was not necessary for Acker to get involved with the plaintiff's plan of care based on this complaint because the lapse in dosing was due to a mistake and was not the result of retaliation or negligence, and it had been resolved. Id. at ¶107.

On December 15, 2023, the plaintiff was seen by Mackenzie for a steroid injection, which he tolerated well. Id. at ¶108. The plaintiff also reported that

he was having increased pain from his bedding and that duloxetine was causing him side effects. Id. Mackenzie recommended that the duloxetine be discontinued and replaced with pregabalin, and that the plaintiff be provided with a softer mattress/pillow when feasible and orthopedic shoes. Id. Two days later, Acker responded to an HSR from the plaintiff in which he complained that Mackenzie's recommendations had not been followed. Id. at ¶109. Acker responded by letting the plaintiff know that Sukowaty had noted on November 10, 2023 that the offsite doctor had recommended pregabalin but Sukowaty would not be prescribing it due to the plaintiff's history of THC use. Id. Sukowaty ordered another pain medication (duloxetine) and another steroid injection. Id. On December 28, 2023, Sukowaty reviewed the plaintiff's offsite recommendations for pregabalin and a medical mattress and noted that she would not be prescribing pregabalin due to the plaintiff's history of THC use. Id. at ¶110. She further noted that a medical mattress was not medically indicated. Id.

On January 4, 2024, Acker responded to an HSR in which the plaintiff complained that his back hurt and that he needed new shoes. Id. at ¶111. Acker responded by letting the plaintiff know that HSU was aware of his back pain and that he was receiving offsite care for this. Id. She also advised that she and Sukowaty had inspected the plaintiff's shoes, and they were appropriate. Id. About a week later, Acker responded to an HSR in which the plaintiff complained about several issues, including when his follow-up for

injections was scheduled. Id. at ¶112. She responded by letting the plaintiff know that he did have a follow-up scheduled. Id.

On January 15, 2024, the plaintiff told Mackenzie that he feared the duloxetine was causing cognitive decline, so Mackenzie recommended he discontinue the duloxetine. Id. at ¶113. Cognitive decline is not a listed side effect of duloxetine. Id. at ¶114. Nevertheless, Sukowaty discontinued the duloxetine per the plaintiff's request and Mackenzie's recommendation. Id.

On January 23, 2024, Acker placed a referral to Sukowaty per the plaintiff's request. Id. at ¶115. One week later, the plaintiff submitted an HSR in which he alleged that Sukowaty's assertion that the plaintiff had a history of drug use was false; the plaintiff requested a DOC-3484 (Request for Amendment/Correction of PHI) to contest this in his medical records. Id. at ¶116. Acker responded by letting the plaintiff know that Sukowaty's note of drug use was based on a conduct report, and that Sukowaty did not have to order a medication she did not believe is safe. Id.

On March 12, 2024, Acker responded to two HSRs from the plaintiff in which he complained about back pain and asked to be seen by a provider by advising him that he was scheduled to be seen. Id. at ¶117.

On March 28, 2024, Sukowaty met with the plaintiff to discuss his lower back pain. Id. at ¶118. Sukowaty noted that the plaintiff had not experienced good relief with amitriptyline, duloxetine, physical therapy, NSAIDs, Tylenol or topicals. Id. Because the plaintiff had officially exhausted all other options, it was appropriate to place a request for him to receive pregabalin. Id. The

32

plaintiff states that he had not exhausted "all" other options. Dkt. No. 55 at ¶118.

Sukowaty believed that it was appropriate for the plaintiff to trial pregabalin at this time because he had tried other formulary options and reported no improvement in his pain. Dkt. No. 33 at ¶119. Also, it had been well over a year since his last conduct report for intoxicants, so she felt it was appropriate to give the plaintiff a chance with pregabalin. Id. On March 28, 2024, Associate Medical Director Dr. Buono approved Sukowaty's pregabalin request for the plaintiff. Dkt. No. 33 at ¶121. The next day, the plaintiff signed a Chronic Pain Management Agreement, in which he agreed to actively participate in his treatment and stated that he understood that the pregabalin could be discontinued if he misused it in any way, failed to participate in random urine/blood tests or was found with any illicit substances. Id. at ¶122.

Also on March 29, 2024, Mackenzie saw the plaintiff for a steroid injection, which he tolerated well. Id. at ¶123. Mackenzie's recommendations simply noted, "same as before," which Sukowaty believes was referring to recommending pregabalin. Id.

On April 1, 2024, Acker responded to an HSR from the plaintiff in which he complained that he was receiving inadequate treatment for his back pain and that Sukowaty failed to see him while he was on hunger strike. Id. at ¶124. Acker responded by telling the plaintiff that she would review his records. Id. The next day, Acker spoke with Sukowaty about the plaintiff's pregabalin prescription, then sent a message to Sukowaty in the electronic medical record

33

to document their conversation. Id. at ¶125. Acker asked her to change the plaintiff's pregabalin to "open and float," which means that the pregabalin capsules are opened and the powder is emptied into a small cup of water. Id. at ¶¶125-126. The plaintiff then must drink the powder/water mix in front of staff to ensure that he cannot divert or misuse the medication. Id. at ¶126. On April 2, 2024, the plaintiff started on pregabalin at 75mg, twice per day. Id. at ¶128.

On April 11, 2024, Mackenzie saw the plaintiff and reported that his previous injection worked well with his pregabalin, reporting an eighty-five percent improvement in pain and one hundred percent improvement in function. Id. at ¶129. Mackenzie recommended that they repeat the injection in three months and continue pregabalin. Id.

On May 9, 2024, Sukowaty saw the plaintiff for a follow-up to his start of pregabalin. Id. at ¶130. The plaintiff said that it initially helped but became less effective over time and he could no longer work out because he was in constant pain. Id. Sukowaty increased his pregabalin prescription to 100mg, twice per day. Id. The plaintiff also requested a medical mattress, chair for his cell and extra pillow, but he did not qualify for these items per policy. Id.

On June 27, 2024, Sukowaty saw the plaintiff for chronic low back pain. Id. at ¶131. The plaintiff reported that he was happy with his dose of pregabalin. Id. He was scheduled for a repeat steroid injection in the near future. Id.

On July 12, 2024, the plaintiff saw Mackenzie for a steroid injection, which he tolerated well. Id. at ¶132. Later that month, the plaintiff told

34

Mackenzie that he was doing well since his previous injection and pregabalin, reporting a ninety percent improvement in pain and one hundred percent improvement in function. Id. at ¶133.

Sukowaty's last day at Columbia was August 16, 2024. Id. at ¶134. At this time, the plaintiff was transferred to Dr. Frederick Freitag's caseload. Id. Sukowaty is no longer directly involved in the plaintiff's care. Id.

On September 26, 2024, Freitag discontinued the plaintiff's pregabalin because the plaintiff had received a conduct report for intoxicants. Id. at ¶135. The plaintiff states that this was a mistake and that he has attempted to correct it. Dkt. No. 55 at ¶135.

On November 22, 2024, the plaintiff saw Mackenzie for another steroid injection, which he tolerated well. Dkt. No. 33 at ¶136. On December 9, 2024, the plaintiff saw Mackenzie for a follow-up to his last steroid injection. Id. at ¶137. Mackenzie recommended that the plaintiff continue epidural steroid injections every three to four months and use Celebrex and Tylenol for pain. Id. The plaintiff states that Columbia staff failed to correct the pregabalin issue, so McKenzie's notes depict that he believes the plaintiff is still prescribed pregabalin. Dkt. No. 55 at ¶137.

J.    Acker's Opinion

Based on Acker's training and expertise, the plaintiff was provided with appropriate medical care at all times relevant to this complaint. Dkt. No. 33 at ¶140. Sukowaty closely monitored the plaintiff and reviewed the offsite specialist's recommendations. Id. She followed DOC policy regarding pregabalin

35

and made sure all other options were exhausted before placing a request for pregabalin. Id. Acker deferred to Sukowaty in determining an appropriate plan of care for the plaintiff. Id. at ¶141. Acker did not believe that Sukowaty was providing the plaintiff with inadequate medical care at any point. Id. Acker did not have the authority to override any of Sukowaty's medical decisions in this case, nor did she have the authority to order medications or treatment or direct the plaintiff's plan of care. Id. at ¶142.

K. Dr. Sukowaty's Opinion

Based on her experience, training and expertise, Sukowaty believes that she provided the plaintiff with appropriate care at all times relevant to this lawsuit. Id. at ¶143. The plaintiff was being provided with regular steroid injections, which he reported were helpful for his pain. Id. He also had a home exercise program from physical therapy specifically tailored to his concerns, a TENS unit when he was in general population and several medication options (acetaminophen, diclofenac gel, and Celebrex). Id. The plaintiff states that he did not have a working TENS unit. Dkt. No. 55 at ¶143.

Once it became apparent that other medication options were not providing the plaintiff with appropriate subjective relief, Sukowaty submitted the request for pregabalin, and the plaintiff signed the pain management agreement. Dkt. No. 33 at ¶144. Sukowaty never disregarded Mackenzie's recommendations; she reviewed Mackenzie's recommendations after each of the plaintiff's offsite appointments and was working through DOC policy and in

the plaintiff's best interest by ensuring all formulary options were exhausted prior to prescribing a high-risk medication such as pregabalin. Id. at ¶145.

The plaintiff's condition is considered chronic, but stable. Id. at ¶146. The plaintiff's condition has not clinically worsened since December 2022. Id. Not being prescribed pregabalin prior to April 2024 would not worsen his condition; it may or may not help with any pain. Id. According to the plaintiff, as documented through McKenzie's notes, he has suffered worsening of numbness and tingling, loss of motion and greater pain since 2022. Dkt. No. 55 at ¶148.

## III.  Analysis

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

37

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that they are entitled to summary judgment because the evidence reflects that Dr. Sukowaty made reasonable medical decisions regarding the plaintiff's treatment in consideration of his medical history, his history of substance abuse and the risks associated with prescribing the medication he requested, pregabalin. Dkt. No. 32 at 1. They contend that the evidence reflects that Acker did not have the authority to overrule Sukowaty's medical decisions and was nevertheless responsive to the plaintiff's medical needs within the authority she maintained as an HSM. Id. at 1-2. According to the defendants, the plaintiff cannot demonstrate that they acted with deliberate indifference. Id. at 23. They assert that, given Acker's limited role and authority, no reasonable jury could believe her actions constituted deliberate indifference. Id. And the defendants contend that Sukowaty did not act with deliberate indifference, but provided the plaintiff with reasonable and appropriate treatment in that she regularly treated him,

38

made appropriate referrals (including to Dr. Mackenize), adjusted her treatment approaches to try to address the plaintiff's pain and considered the safest and most appropriate treatment approaches in light of the risks to the plaintiff's health and safety and security of the institution. Id.

The court analyzes a plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant

39

was essentially criminally reckless, that is, ignored a known risk.'" <u>Stewart</u>, 14 F.4th at 763 (quoting <u>Huber v. Anderson</u>, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." <u>Ayoubi v. Dart</u>, 724 F. App'x 470, 474 (7th Cir. 2018) (citing <u>Farmer</u>, 511 U.S. at 837, 844–45).

In the context of a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." <u>Stewart</u>, 14 F.4th at 763 (quoting <u>Johnson v. Dominguez</u>, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

<u>Id.</u>

The defendants do not contend that the plaintiff did not have a "serious medical need," the Eighth Amendment's objective prong. The court assumes for the purpose of summary judgment that the plaintiff's condition amounted to a serious medical need. <u>See</u> <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1373 (7th Cir. 1997) (serious medical need "is one that has been diagnosed by a physician as

40

mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention[]") (quotation omitted)). The court will focus on whether the defendants acted with deliberate indifference.

The court allowed the plaintiff to proceed on a claim against Dr. Sukowaty based on allegations that she did not follow Dr. Mackenzie's treatment recommendation for the plaintiff's nerve pain, resulting in unnecessary pain and the worsening of his condition. The plaintiff transferred to Columbia in October 2022, and he received ongoing medical care and treatment from Sukowaty, his assigned medical provider. The plaintiff's medical treatment included physical therapy, an MRI for his back, diclofenac gel (an anti-inflammatory topical cream), Celebrex, epidural steroid injections, an MRI for his knee, medical shoes, Tylenol and amitriptyline and duloxetine (antidepressants used to treat nerve pain that have lower risks of abuse or interactions with K2 or THC). In addition, Sukowaty referred the plaintiff to Mackenzie for evaluations and for steroid injections. Mackenzie first recommended that the plaintiff receive pregabalin on December 16, 2022. He made six further recommendations that the plaintiff receive pregabalin, along with other treatment recommendations. Sukowaty followed most of Mackenzie's treatment recommendations, but initially did not authorize pregabalin because of the plaintiff's history of substance abuse and because the plaintiff had received conduct reports involving intoxicant possession and/or use. Sukowaty declined to prescribe it later because of the plaintiff's history of K2 and THC

use. Pregabalin may have negative side effects if mixed with certain other medicines, alcohol or illicit drugs. Prescribing pregabalin to an incarcerated individual with a history of illicit substance use poses a risk to the individual of possible adverse side effects. (The plaintiff points out that there was no risk of him diverting pregabalin to other incarcerated individuals or of storing it to take more because when Sukowaty approved pregabalin for him in March 2024, it was prescribed "open and float." But the concerns cited by the defendants exist even with the medication being prescribed in that manner.)

The plaintiff reported some pain relief with other treatment options, especially steroid injections, and the medical record includes progress in meeting his daily living goals. But his subjective reports of pain continued, and he requested more pain relief. On March 28, 2024, Sukowaty decided to place a request for the plaintiff to receive pregabalin because the plaintiff had exhausted all other options and had gone well over a year since his last conduct report for intoxication. Sukowaty noted that the plaintiff had not experienced good relief with amitriptyline, duloxetine, physical therapy, NSAIDs, Tylenol or topicals. The plaintiff experienced improved pain relief with pregabalin and steroid injections.

"An inmate may establish deliberate indifference by demonstrating that prison officials ignored a specialist's instructions." Riley v. Waterman, 126 F.4th 1287, 1295-96 (7th Cir. 2025) (citing Zaya v. Sood, 836 F.3d 800, 805-06 (7th Cir. 2016)). However, "[d]isagreement . . . between two medical professionals[ ] about the proper course of treatment generally is insufficient,

by itself, to establish an Eighth Amendment violation." Id. at 1296 (quoting Pyles, 771 F.3d at 409); see also Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006). Mackenzie did not provide "instructions" that the plaintiff receive pregabalin—he recommended it. And Sukowaty did not ignore Mackenzie's recommendation—she exercised her professional judgment and followed DOC protocol, based on the plaintiff's history, to exhaust other potential pain treatments options before prescribing pregabalin. Sukowaty did not disregard the plaintiff's medical condition.

"[A] medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment." Doughty, 433 F.3d at 1012-13 (citing Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."). The plaintiff has not demonstrated that Sukowaty failed to exercise professional judgment while treating him. The plaintiff's disagreements with Sukowaty's

43

treatment decisions do not prove that she was deliberately indifferent. See Pyles v. Fahim, 771 F.3d 403, 413 (7th Cir. 2014) (plaintiff's disagreement with doctor's treatment decisions for back pain did not amount to deliberate indifference); see also Norfleet, 439 F.3d at 396. A reasonable factfinder could not conclude that Sukowaty violated the plaintiff's constitutional rights by not prescribing pregabalin earlier.

Likewise, the plaintiff has not established that Acker acted with deliberate indifference. Acker did not have the authority to prescribe medication or override Sukowaty's treatment decisions. Acker's role was limited to responding to the plaintiff's HSRs, meeting to discuss his care and referring questions to Sukowaty as needed. She made no substantive treatment decisions and had no authority to override Sukowaty's treatment protocols. The record shows that Acker responded to the plaintiff's HSRs that she received and referred the plaintiff to caregivers. Acker cannot be held liable for failure to act outside the scope of her authority. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Id. at 595-96. For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). Acker did not violate the plaintiff's constitutional rights.

The court will grant the defendants' motion for summary judgment as to the plaintiff's Eighth Amendment claims. Because the court has concluded that the plaintiff has no federal claim, the court will relinquish supplemental

44

jurisdiction over the plaintiff's state law claim. See 28 U.S.C. §1367(c)(3); <u>Lavite v. Dunstan</u>, 932 F.3d 1020, 1034-35 (7th Cir. 2019).

## IV.    Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 31.

The court **DENIES** the plaintiff's motion to stay court proceedings. Dkt. No. 53.

The court **DENIES** the plaintiff's motion for extension of time. Dkt. No. 54.

The court **CONSTRUES** the plaintiff's request for leave to file interlocutory appeal as motion for hearing and **DENIES** the motion. Dkt. No. 57.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a

motion *in this court*. <u>See</u> Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. <u>Id.</u>

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 17th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**